# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

WARREN RICHARDS, *individually and on behalf of all others similarly situated*,

           Plaintiff,

v.

SHEIN DISTRIBUTION CORPORATION,

           Defendant

)
)
)
)
)
)
)
)
)
)
)

No. 1:25-cv-01385-TWP-TAB

Hon. Tanya Walton Pratt

Hon. Magistrate Tim A. Baker

# PLAINTIFF WARREN RICHARDS' OPPOSITION TO DEFENDANT SHEIN DISTRIBUTION CORP.'S <u>MOTION TO STAY</u>

## INTRODUCTION

Defendant Shein Distribution Corporation asks this Court to halt this case entirely pending the outcome of the Seventh Circuit's appeal in *Steidinger v. Blackstone Medical Services, Inc.*, 25-2398 ("*Blackstone*"). ECF 18–19. But this request comes before Chief Judge Tanya Walton Pratt, who only last year rejected a request for a stay pending appeal in *Doe v. University of Southern Indiana*, 2024 WL 3637789, at *1 (S.D. Ind. 2024). There, Chief Judge Pratt held that the movant had failed to show a likelihood of success on appeal, irreparable harm, or that the public interest justified halting the case. She emphasized that litigation should proceed to dispositive motions and trial even while certain issues were on appeal, because "[c]ontinuing the case … will simplify the issues in the case and streamline the case for trial." *Id.* at *3.

That same is true here, first and foremost because the legal issue presented by both the motion to dismiss and the pending Seventh Circuit appeal in *Blackstone* is one that should—and presumably will—be resolved in Plaintiff's favor. The law is well-settled that text messages qualify as "calls" under the TCPA. Many courts and the FCC have so held, correctly. So Defendant's speculation that the Seventh Circuit might reach a contrary conclusion in *Blackstone* does not justify freezing this case indefinitely. As Chief Judge Pratt held in *Doe*, speculation is not a substitute for the demanding showing required to justify a stay.

This Court should deny the motion to stay, resolve the pending motion to dismiss in Mr. Richards' favor without awaiting the outcome of *Blackstone*, and allow this litigation to proceed.

## BACKGROUND

### I.    Legal background

Because the likelihood of Shein's view of the law prevailing is central to resolution of this motion, we provide a brief overview of the law relevant to the merits of Shein's pending motion to dismiss.

**1.** Section 227(c) of the Telephone Consumer Protection Act empowers the FCC to decide whether to create a national Do Not Call List, and to determine the rules that will govern it. *See* 47 U.S.C. § 227(c)(1)–(4).

The guiding purpose of a Do Not Call List is "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." *Id.* § 227(c)(1). The key operative term there is "telephone solicitations," which are defined in the TCPA as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." *Id.* § 227(a)(4). As one court recently observed, that definitional language is "more concerned with the purpose of the telephone communications [that are prohibited] than the form in which those communications are transmitted." *Wilson v. Medvidi, Inc.*, 2025 WL 2856295, at *3 (N.D. Cal. 2025); *see, e.g.*, *Hulce v. Zipongo Inc.*, 132 F.4th 493, 499–500 (7th Cir. 2025) (Do Not Call List liability turned on whether a text message had the requisite commercial purpose).[1]

The statute grants the FCC broad discretion to determine the rules governing the Do Not Call List. The statute expressly empowers the FCC to make rules "that the Commission determines are most effective and efficient to accomplish the purposes of this section." 47 U.S.C. § 227(c)(1)(E) (emphasis added). And it directs the FCC to evaluate alternative approaches based on open-ended criteria such as their "effectiveness in protecting … privacy rights" and their "other advantages and disadvantages." *Id.* § 227(c)(1)(A).

Any Do Not Call List regulations that the FCC establishes must meet certain statutory criteria. *See id.* § 227(c)(3)–(4). For example, the rules must require phone companies to notify

---

[1] Unless otherwise specified, all internal quotation marks, alterations, and citations are omitted from quotations throughout.

their subscribers about the Do Not Call List, and must specify how frequently the list will be updated. *Id.* § 227(c)(3)(B), (I). And—as relevant here—the statute specifies that the FCC's rules must "prohibit any person from making or transmitting a telephone solicitation to the telephone number of any subscriber included in" the national Do Not Call List. *Id.* § 227(c)(3)(F).

Finally, section 227(c)(5) provides for private enforcement of the FCC's Do Not Call List rules. That provision grants an express private right of action to sue in federal court to any "person who has received more than one telephone call within any 12-month period … in violation of the regulations." 47 U.S.C. § 227(c)(5). That is "a straightforward provision designed to achieve a straightforward result"—to enable "each person to protect his own personal rights" conferred by Section 227(c). *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 650 (4th Cir. 2019).

**2.** The FCC has implemented section 227(c)(3)(F) by adopting 47 C.F.R. § 64.1200(c)(2), which generally prohibits "any telephone solicitation to … [a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry." The FCC has also made clear in a series of orders and, more recently, in a formal regulation that this rule applies to anyone "making telephone solicitations or telemarketing calls or text messages to wireless telephone numbers." 47 C.F.R. § 64.1200(e); *see* 18 FCC Rcd. 14014, 14115 ¶ 165 (July 3, 2003); 30 FCC Rcd. 7961, 8020 ¶¶ 115–16 (July 10, 2015); *In re Hernandez*, 2018 WL 6830220, at *1 ¶ 3 (FCC Dec. 21, 2018); 88 Fed. Reg. 20800, 20802 ¶ 6 (Apr. 7, 2023); 38 FCC Rcd. 12247, 12256–57 ¶ 26 (Dec. 18, 2023).[2]

---

[2] The FCC's interpretation of the word "call" was first discussed in the context of the TCPA's nearby prohibitions on autodialed calls, found in section 227(b). *See* 18 FCC Rcd. at 14115 ¶ 165. But the FCC has since clarified that it applies to section 227(c), too. *See* 38 FCC Rcd. at 12256–57 ¶ 26.

## II.    Factual background

Mr. Richards has a personal cell phone that he uses to communicate with friends and family and for other household tasks like scheduling appointments. Compl. (ECF 1) ¶¶ 8–14. He registered its phone number on the nationwide Do Not Call List. *Id.* ¶ 15.

Despite having no existing relationship with Mr. Richards, and without his consent, Shein intentionally sent Mr. Richards multiple telemarketing text messages in the space of less than a month. *Id.* ¶¶ 16–22. For purposes of this motion, it is undisputed that those text messages all were sent in violation of the FCC's Do Not Call List rules. *See* 47 C.F.R. § 64.1200(c)(2), (e).

Mr. Richards then brought this suit against Shein to enforce his rights under the TCPA and its implementing regulations, as well as the rights of others who also received unauthorized marketing messages from the company despite listing their numbers on the Do Not Call List. Compl. ¶¶ 25, 31–35, 53–61.

Shein Distribution moved to dismiss, ECF 16–17, and for a stay pending the outcome of the Seventh Circuit appeal in *Blackstone*, ECF 18–19. At a telephonic initial pretrial conference on September 30, the Court suspended briefing of the motion to dismiss and discovery pending a decision on the motion to stay, which "remains under advisement pending a ruling following the completion of briefing." ECF 25.

### LEGAL STANDARD

"A party has no right to a stay, and the party seeking a stay bears the burden of proving that the Court should exercise its discretion in staying the case." *Ind. State Conf. of NAACP v. Lawson*, 2018 WL 4853567, at *3 (S.D. Ind. Oct. 5, 2018) (Pratt, J.). That burden applies equally to discovery stays. See *Sparger-Withers v. Taylor*, 2022 WL 1185747, at *2 (S.D. Ind. Apr. 21, 2022) (Garcia, M.J.).

The standard for granting a stay pending appeal mirrors that for a preliminary injunction. Courts weigh four factors: whether the movant has made a strong showing of likelihood of success on the merits, whether the movant will suffer irreparable injury without a stay, whether issuance of the stay will substantially injure the other parties, and where the public interest lies. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *A&F Enters., Inc. II v. IHOP Franchising LLC*, 742 F.3d 763, 766 (7th Cir. 2014). As Chief Judge Pratt emphasized recently in *Doe*, the "burden to obtain a stay" rests on the party requesting it, and failure to address the required factors weighs strongly against granting relief. 2024 WL 3637789, at *3.[3]

## ARGUMENT

Defendant's stay request rises or falls on its assertion that the defendant is likely to prevail on appeal in *Blackstone*—i.e., that the Seventh Circuit will upend decades of settled law and hold that the TCPA's do-not-call protections do not apply to text messages. That is speculative at best and flatly inconsistent with the statute, the FCC's rules, and the overwhelming weight of authority. This brief therefore focuses primarily on explaining why Shein is wrong to argue that the TCPA's Do Not Call List provisions do not provide protection from unwanted text messages. It then briefly explains why other considerations cut against a stay as well.

---

[3] Although the posture is slightly different here than a typical motion for a stay pending appeal—which generally concerns an appeal arising out of the same proceeding, rather than a different case presenting the same legal issue—Mr. Richard submits that it would be appropriate to apply that standard here, where the parties are disputing whether the entire litigation should be stayed pending an appeal. In any event, the result is no different under the standard identified in Shein's motion: "(1) whether a stay will simplify the issues in question and streamline the trial; (2) whether a stay will reduce the burden of litigation on the parties and on the court; and (3) whether a stay will unduly prejudice or tactically disadvantage the nonmoving party." ECF 19 at 2–3 (quoting *Herron v. Gold Standard Baking, Inc.*, 2021 WL 1340804, at *1 (N.D. Ill. Apr. 9, 2021)).

I.      **Defendant cannot establish a likelihood of success on appeal.**

Shein contends that a single use of the word "call" in section 227(c)(5)'s private right of action means that the Do Not Call List rules cannot apply to text messages. That's the same contention that's at issue in *Blackstone*. And it's incorrect.

As courts and the FCC have long and recently recognized, the statute's ordinary meaning, structure, and purpose refute that argument: The word "call" as used in the TCPA refers to any attempt to communicate by telephone, so the FCC may prohibit telemarketing texts to numbers on the Do Not Call List. The context and purpose of the TCPA's Do Not Call List provisions reinforce that interpretation. And Shein's arguments for its restrictive interpretation all fail—the company goes about interpreting the word "call" in section 227(c)(5) all wrong, and ends up assigning it a meaning that is at odds with the rest of the statute in multiple ways.

Moreover, because section 227(c) is structured as an express delegation of discretionary authority to the FCC, any doubt about the answer here simply means that Congress intended the agency's reasonable judgment to control.

A.      **The plain meaning of the word "call" includes text messages**

**1.** To interpret a statutory term, courts "look to the meaning of the word at the time the statute was enacted, often by referring to dictionaries." *Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860, 863 (7th Cir. 2016). Courts have long recognized that the word "call" in the TCPA refers to any attempt to communicate by telephone, including text messages. That's because the "ordinary, contemporary, common meaning" of the word "call" in this context is "'to communicate with or try to get into communication with a person by a telephone.'" *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953–54 & n.3 (9th Cir 2009) (quoting *Webster's Third New International Dictionary* 318 (2002)); *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1007 (N.D. Ill. 2010) (St. Eve, J.) (same). This basic definition of the word "call," which is the relevant

one given the context and the word's pairing with "telephone" in section 227(c)(5), appears in many dictionaries from around the time of the TCPA's passage. *See, e.g.*, *Webster's New Collegiate Dictionary* (9th ed. 1991) ("to get or try to get in communication with by telephone"); *Oxford English Dictionary* (2d ed.1989) ("[a] summons or communication by telephone").

Courts have long recognized that the definition identified in *Satterfield*—any attempt to communicate with someone by telephone—is the meaning of "telephone call" that Congress would have intended in 1991, when the TCPA was enacted. *See, e.g.*, *Ashland Hosp. Corp. v. Serv. Emps. Int'l Union, Dist. 1199 W.V./Ky./Oh.*, 708 F.3d 737, 742 (6th Cir. 2013); *Sagar v. Kelly Auto. Grp.*, 2021 WL 5567408, at *4 (D. Mass. 2021); *Schaevitz v. Braman Hyundai, Inc.*, 437 F. Supp. 3d 1237, 1247 (S.D. Fla. 2019). And texting is, of course, a means of communicating with someone by telephone. So that established definition readily encompasses texts. *See, e.g.*, *Satterfield*, 569 F.3d at 953–54; *Lozano*, 702 F. Supp. 2d at 1007; *Wilson v. Medvidi*, 2025 WL 2856295, at *2 (N.D. Cal. 2025).

That established meaning of the word "call" is especially clear in the nearby autodialer provisions in section 227(b) of the original TCPA. Absent contrary evidence, a statutory word or phrase is presumed to bear a consistent meaning across different provisions of a statute. *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 85 (2017). Here, the word "call" is used extensively in the provisions of the statute that prohibit automatic dialing technology and robocalls, which were also part of the statute when it was first enacted in 1991. Most notably, section 227(b) prohibits using autodialer or robocall technology "to make any call … to any telephone number assigned to a paging service." 47 U.S.C. § 227(b)(1)(A)(iii). A typical paging device in the early 1990s would have displayed an incoming message as written text—usually displaying a phone

number to call.[4] So the use of the word "call" in connection with pagers in section 227(b) establishes "that the term 'call' cannot invoke only the common usage … in which a 'call' refers to oral communication between two parties via telephone." *Lozano*, 702 F. Supp. 2d at 1005; *see also Abbas v. Selling Source, LLC*, 2009 WL 4884471, at *4 (N.D. Ill. 2009). Both the FCC and courts have therefore long held that section 227(b)'s autodialer protections apply to texts as well as traditional voice calls. *E.g.*, *Lozano*, 702 F. Supp. 2d at 1003–09.[5]

Indeed, the FCC determined as early as 2003 that, when the TCPA says "call," it must mean not just traditional voice calls but also modern text messages. 18 FCC Rcd. at 14115 ¶ 165. As the FCC recognized then, the statutory text "encompasses both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls." *Id.* The FCC has consistently adhered to that position ever since. *See* 30 FCC Rcd. 7961, 8020 ¶¶ 115–16 (2015); *In re Hernandez*, 2018 WL 6830220, at *1 ¶ 3 (FCC Dec. 21, 2018); 88 Fed. Reg. 20800, 20802 ¶ 6 (Apr. 7, 2023); 38 FCC Rcd. 12247, 12256–57 ¶ 26 (2023).

To be sure, the FCC first interpreted the word "call" to include text messages in the context of the TCPA's prohibitions on autodialed calls in section 227(b). But that is unsurprising, because the word "call" is used more extensively in that part of the statute, whereas section 227(c) mainly uses the defined term "telephone solicitation." *See Medvidi*, 2025 WL 2856295, at *3. And the FCC has since confirmed in a formal regulation that its 2003 interpretation of the word "call" also

---

[4]    *See, e.g.*, Paging Network, Inc., Annual Report, at 8 (1991), https://digital.library.mcgill.ca/images/hrcorpreports/pdfs/6/639549.pdf (noting that 92 percent of the company's pagers could "transmit a numeric message such as a telephone or account number").

[5] *See also, e.g.*, 38 FCC Rcd. at 12256–57 ¶ 26 (2023); 18 FCC Rcd. at 14115 ¶ 165 (2003); *Satterfield*, 569 F.3d at 952–54; *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 269 n.2 (3d Cir. 2013); *Keating v. Peterson's Nelnet, LLC*, 615 F. App'x 365, 370–71 (6th Cir. 2015); *Hudson v. Palm Beach Tan, Inc.*, 2024 WL 4190513, at *7 n.6 (M.D.N.C. 2024) ("Courts have routinely found that the phrase 'call' in subsection (b) of the statute includes text messages.").

applies to text messages in the Do Not Call List context, specifically. *See* 47 C.F.R. § 64.1200(e); 38 FCC Rcd. at 12256–57 ¶ 26.

Although it is only briefly discussed in the relevant order, the FCC's initial interpretation of the word "call" to include texts in 2003 is especially helpful to understanding the word's original meaning as of 1991. *See* 18 FCC Rcd. at 14115 ¶ 165 (2003). When Congress originally drafted the TCPA, text messages didn't exist. *See Keating*, 615 F. App'x at 370; *Medvidi*, 2025 WL 2856295, at *2. And texting didn't achieve widespread popularity until the 2000s.[6] So the FCC's understanding of "call" in 2003 surely approximated its 1991 meaning more closely than our 2025 intuitions, which reflect a world where texting has been ubiquitous for decades. *Cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("the contemporaneous construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect").

Indeed, because it has been broadly understood for decades that the word "call" in the TCPA includes texts, courts have commonly treated that interpretation as obvious and uncontroversial. *See, e.g.*, *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call' …."). And that has remained true even after the *McLaughlin* and *Loper Bright* decisions that Shein says (ECF 17 at 3) should

---

[6] *See, e.g.*, David Crystal, *Txtng: The Gr8 Db8* 4 (2008) ("The average number of texts per GSM customer in 1995 was 0.4 per month; by the end of 2000 it was still only 35."); Meghan Keane, *Texting Overtakes Voice in Mobile Phone Usage*, WIRED (Sept. 29, 2008), https://www.wired.com/2008/09/texting-overtak (noting that the number of text messages surpassed the number of voice calls for the first time in 2007).

be causing a sea change. *See, e.g.*, *Hulce v. Zipongo, Inc.*, 132 F.4th 493, 496–97 (7th Cir. 2025) (taking as a given that texts can be actionable "telephone solicitations" under section 227(c)).[7]

The FCC's conclusion that "the term 'call' includes a text message" therefore reflects "the plain meaning of the statutory text as it has been understood by consumers, the FCC, and courts since the TCPA's passage." *Medvidi*, 2025 WL 2856295, at \*3.

### B.    That interpretation of the word "call" aligns section 227(c)'s private right of action with its substantive provisions.

Shein's argument focuses mainly on the single use of the word the "call" in section 227(c)(5). *See* ECF 17 at 5–11. But reading section 227(c)(5)'s private right of action in context with the substantive Do Not Call List provisions elsewhere in section 227(c) provides additional confirmation that text messages are covered.

To see why, start with what is the core of section 227(c)—its prohibition on "making or transmitting a telephone solicitation to the telephone number of any subscriber" on the Do Not Call List. 47 U.S.C. § 227(c)(3)(F). Text messages, of course, are communications "ma[de] or transmitt[ed]" to a "telephone number." *Id.* And it is well-established that the residential telephone "subscriber[s]" protected by the Do Not Call List include cell phone subscribers: The FCC determined that cell phone subscribers are covered when it first created the Do Not Call List rules, *see* 18 FCC Rcd. 14014, 14037–39 ¶¶ 33–36 (2003), and courts have overwhelmingly agreed with that interpretation of the statute ever since, *see, e.g.*, *Harriel v. Bealls, Inc.*, 2025 WL 2379617, at \*2 (M.D. Fla. 2025); *Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 203 & n.4 (S.D.N.Y. 2024) (collecting cases).

---

[7] *See also, e.g.*, *Bosley v. A Bradley Hosp., LLC*, 2025 WL 2686984, at \*5 (S.D. Fla. 2025); *Dawson v. Porch.com*, 2024 WL 4765159, at \*5 & n.4 (W.D. Wash. 2024) (agreeing that a text is a call "whether deference to the agency's interpretation is appropriate or not").

The term "telephone solicitation" also clearly encompasses text messages. The statute expressly defines a "telephone solicitation" to mean "a telephone *call or message* … which is transmitted to any person" for commercial purposes, with certain exceptions not relevant here. 47 U.S.C. § 227(a)(4) (emphasis added). A text message, no less than a voice call, can be "transmitted." *See, e.g.*, *Transmit*, *Webster's New Collegiate Dictionary* (9th ed. 1991) ("to send out (a signal) either by radio waves or over a wire"). And the "telephone solicitation" definition's reference to a "call or message" covers texts even more clearly than the word "call" standing alone. As explained above, the "the ordinary, contemporary, and common meaning" the word "call" in the TCPA encompasses text messages. *Satterfield*, 569 F.3d at 953–54 & n.3; *see supra*, Part I.A. And contemporary definitions of the word "message" do too—a message is "[a]ny notice, word, or communication, *no matter the mode and no matter how sent*." *Message*, *Black's Law Dictionary* (6th ed. 1990) (emphasis added); *see also, e.g.*, *Message*, *Webster's New Collegiate Dictionary* (9th ed. 1991) ("a communication *in writing*, in speech, by signals") (emphasis added); *Message*, *Oxford English Dictionary* (2d ed. 1989) ("an oral *or written* communication sent from one person to another") (emphasis added). So "call" and "message" both describe communication with a phone, and neither differentiates between oral and written mediums.

More generally, the definition of "telephone solicitation" focuses not on a communication's form but on whether it has "the purpose of encouraging" various kinds of commercial transactions. 47 U.S.C. § 227(a)(4); *see, e.g.*, *Hulce*, 132 F.4th at 499–500 (Do Not Call List liability turned on whether a text message had the requisite commercial purpose). At the same time, the statute uses broad and inclusive language to describe the myriad ways such a communication might be conveyed—the FCC is directed to prohibit "making *or* transmitting" a telephone solicitation to "any" listed number, and a telephone solicitation is a "call *or* message"

that is "transmitted to *any* person." 47 U.S.C. § 227(a)(4), (c)(3)(F) (emphases added). Congress presumably used all that broad and disjunctive language to capture a wide range of potential communication mediums, including text messages. *See Pepper v. GVG Cap. LLC*, 677 F. Supp. 3d 638, 643 (S.D. Tex. 2023) (rejecting an argument that "text messages are not actionable" under section 227(c) because it "fails in the face of the statutory text, which refers to 'telephone call[s] or message[s]'" (quoting 47 U.S.C. § 227(c)).[8] The statutory definition of "telephone solicitation" therefore "makes clear that Congress was more concerned with the purpose of the telephone communications … than the form in which those communications are transmitted." *Medvidi*, 2025 WL 2856295, at *3.

Finally, the purpose of the Do Not Call List provisions further supports that interpretation. Congress's stated goal was "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). And "a voice message or a text message are not distinguishable in terms of being an invasion of privacy." *Satterfield*, 569 F.3d at 954; *accord Medvidi*, 2025 WL 2856295, at *3; *Wilson v. Skopos Fin., LLC*, 2025 WL 2029274, at *4 (D. Or. 2025). Indeed, nothing in the statute gives any suggestion that Congress thought "oral messages were more invasive or objectionable than written ones." *Medvidi*, 2025 WL 2856295, at *3.

### C.    The arguments for a narrower interpretation are unpersuasive.

Shein would have this Court interpret the Do Not Call List provisions more narrowly, insisting that the word "call" in section 227(c)(5) can only mean "voice call," and therefore the statute categorically excludes text messages. Its arguments mainly rely on two recent district court

---

[8] *See also, e.g.*, *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 312 (1978) ("any person" has a "naturally broad and inclusive meaning"); *United States v. Krilich*, 159 F.3d 1020, 1028 (7th Cir. 1998) (statute that used "any" multiple times was "straightforward and broad").

cases, *Jones v. Blackstone Medical Services*, 2025 WL 2042764 (C.D. Ill. 2025)—the decision that is on appeal before the Seventh Circuit in *Blackstone*—and *Davis v. CVS Pharmacy, Inc.*, 2025 WL 2491195 (N.D. Fla. 2025). But none of the arguments made by Shein in its motion to dismiss brief (ECF 17) or in those outlier cases is persuasive.

**1.** Consider first how Shein reads the word "call" in section 227(c)(5). It repeats a few basic arguments for reading that word as implicitly limited to voice calls. But all of them go about interpreting the statute wrong.

**a.** First, Shein (parroting *Jones*) insists that "call" cannot encompass text messages because "[t]ext messaging was not an available technology in 1991." ECF 17 at 1, 9 (quoting *Jones*, 2025 WL 2042764, at *4).

That's not how statutory interpretation works. Of course, text messaging did not exist in 1991, so Congress didn't have it specifically in mind. *See Medvidi*, 2025 WL 2856295, at *2. But it is black-letter law that statutes are not "confined to the particular applications contemplated by the legislators." *Diamond v. Chakrabarty*, 447 U.S. 303, 315–16 (1980) (collecting cases); *see also, e.g.*, *Hively v. Ivy Tech Cmty. Coll.*, 853 F.3d 339, 344–45 (7th Cir. 2017) (en banc). Instead, "statutes must be permitted to apply to technologies not in existence when a statute was drafted." *Lozano*, 702 F. Supp. 2d at 1008 (citing *Squillacote v. United States*, 739 F.2d 1208, 1213 (7th Cir. 1984)).

Indeed, "[w]hile every statute's *meaning* is fixed at the time of enactment," it is commonplace that "new *applications* may arise in light of changes in the world." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018). That's why, for example, "a 1925 statute dealing with 'news media' … appl[ies] to television." *Squillacote*, 739 F.2d at 1213. Or why a 1991 law that

13

said "no vehicles in the park" would prohibit Cybertrucks and Priuses, not just Mustangs and Corollas. *See id.* (similar example with Volkswagens).

The same is true here. "In determining whether section 227(c) applies to text messages, the Court looks to the plain meaning of the text rather than the specific facts or technology that Congress may have had in mind in 1991 at the time of the TCPA's passage." *Medvidi*, 2025 WL 2856295, at *2. In other words, the 1991 meaning of the word "call," which "refers to both oral and written communications," is what matters. *Id.*; *see Lozano*, 702 F. Supp. 2d at 1007. And that remains true even if text messages were not the "particular manifestation of [the] problem" that Congress had front of mind at the time. *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 665 (D.C. Cir. 2009); *see Diamond*, 447 U.S. at 315; *Hively*, 853 F.3d at 344–45.[9]

Simply put, this is not a case where the Court needs to "supplant or alter plain language" in order to "encompass new technologies." *Contra* ECF 17 at 13. The plain meaning of the statute Congress used in 1991 already covers modern text messages. *See supra*, Part I.A–B.

**b.** Next, Shein says that in "modern parlance" it sounds odd to refer to a text message as a telephone call. MTD at 1. *Jones* and *Davis* also rely on that same intuition—both courts found it

---

[9] Shein likens this case to *Facebook, Inc. v. Duguid*, where the Supreme Court declined to read the TCPA's technical definition of prohibited autodialing technology more broadly than the specific text would bear. *See* 592 U.S. 395 (2021). But contrasting that case with this one actually underscores why Shein arguments don't work. Here's the autodialer definition that the Court interpreted in *Duguid*: "equipment which has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." *Id.* at 402 (quoting 47 U.S.C. § 227(a)(1)). That precise and technical definition reflects Congress's express focus on a specific "random or sequential number generator technology" that "caused unique problems" the TCPA was trying to address. *Id.* at 408. Thus, "*Duguid's* quarrel [was] with Congress, which did not define an autodialer as malleably as he would have liked." *Id.* at 409. But the plain meaning of the word "call" and the structure and purpose of the statute here suggest the opposite: Congress *did* use language that was broad enough to evolve with the times, so the plain text of section 227(c) *does* encompass modern text messages.

impossible to read "call" in anything but the familiar colloquial sense, and so concluded that the "analysis begins and ends there." *Davis*, 2025 WL 2491195, at *1.[10]

No doubt most people wouldn't use the word "call" the way the TCPA does in casual conversation, especially nowadays. In 2025, text messages are ubiquitous, and society has developed a whole vocabulary around them—think "emoji," "group chat," "read receipt," and so forth. As part of that texting-specific lexicon, we have become very accustomed to saying "text message" or just "text" to describe written messaging between phones.

But statutory interpretation does not turn on modern colloquial usage. If anything, when language has evolved since a statute's enactment, current linguistic intuitions may be affirmatively misleading. For example, in *New Prime, Inc. v. Oliveira*, the Supreme Court explained that the statutory term "contracts of employment" in the Federal Arbitration Act "might call to mind only agreements between employers and employees" today, and thus exclude independent contractors. 586 U.S. 105, 114 (2019). But that "modern intuition" did not match the "evidence of the term's meaning at the time of the Act's adoption," which revealed that "'contract of employment' usually meant nothing more than an agreement to perform work." *Id*. The Supreme Court therefore held that the statutory exception at issue reached not just conventional "employees," as modern parlance might suggest, but also modern independent contractors, as definitions from the time of the statute's enactment suggested. *See id.* at 114–16. In other words, when a mismatch arises between contemporary intuitions and the original meaning at the time of enactment, it is the latter that controls—not (as Shein's cases put it) how an "ordinary person would think of a text message"

---

[10] *See Davis*, 2025 WL 2491195, at *1 ("No normal person refers to a text message, or thinks of a text message, as a 'call.'"); *Jones*, 2025 WL 2042764, at *4 ("[I]n today's American parlance, 'telephone call' means something entirely different from 'text message.' Thus, under a plain reading, Section 227(c)(5) of the TCPA does not regulate text messages.").

today, *Davis*, 2025 WL 2491195, at *1, or "today's American parlance," *Jones*, 2025 WL 2042764, at *4.

**c.** Third, Shein argues (ECF 17 at 8 n.3, 10) that reading "call" to include text messages risks subjecting other smartphone capabilities—such as "e-mails" "app-to-app messages" and "push notifications"—to Do Not Call List regulation. But that argument just confirms that Shein's interpretation of "call" ignores its context. A Do Not Call List violation occurs only when a prohibited "telephone solicitation" is directed to a listed "telephone number." 47 U.S.C. § 227(c)(3)(F). An e-mail address is not a "telephone number," so merely receiving e-mail on a phone doesn't make it a TCPA violation. The same goes for most push notifications. And to the extent there is any question about how the Do Not Call List rules might apply to, say, certain modern messaging apps—that sort of question is precisely why Congress left the specifics of any Do Not Call List rules up to the expert judgment of the FCC. *See* 47 U.S.C. § 227(c)(1)(A)–(E); *cf. U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 718 (D.C. Cir. 2016) (an express delegation was evidence that Congress expected telecommunications technology "to evolve and therefore charged the [FCC] with the continuing obligation to define it"). There's no technological slippery slope here. But even if there were, Congress gave the FCC primary responsibility for policing it.

**2.** Shein's interpretation fares no better when it comes to the broader statutory context in which the word "call" in section 227(c)(5) appears.

**a.** Shein barely engages with the substantive Do Not Call List provisions of the statute in the remainder of section 227(c). When it does, it seems to take the position (ECF 17 at 12 n.4) that text messages are neither calls *nor* messages, and thus don't fall within the statutory definition of

a "telephone solicitation" at all.[11] That's wrong. *See supra*, Part I.B. That argument is little more than a repackaging of the company's erroneous view that Congress could not possibly have drafted the statute to cover text messages before they existed. *See* ECF 17 at 12 n.4 (arguing that it is "clear" Congress could not be referring "to a technology yet to exist"). And *that* way of interpreting the statute is also wrong, for reasons already explained. *See supra*, Part I.C.1.a.

Perhaps because "text messages aren't messages" isn't a promising avenue, Shein also attacks the broad definition of "telephone solicitation" a different way. Citing *Davis*, the company contends that by inclusively defining a "telephone solicitation" as "the initiation of a telephone call or message" in section 227(a)(4), and then later referring only to a "telephone call" in section 227(c)(5), Congress intended to give section 227(c)(5)'s private right of action a narrower scope than the substantive provisions of section 227(c). *See* ECF 17 at 12 (citing *Davis*, 2025 WL 2491195, at *2). On this theory, the FCC presumably *can* prohibit telemarketing texts to numbers on the Do Not Call List, but private litigants may enforce those rights only when a voice call is involved.

That reading of the statute doesn't make sense either. Neither Shein nor *Davis* identifies any reason Congress would have intended that odd result. And the text of section 227(c)(5) suggests otherwise—first, by being much more explicit about different ways that the private right of action actually is limited (requiring "more than one" call "in any 12-month period"); and, second, by linking the private right of action to "violation of the regulations in this subsection"

---

[11] Shein's theory seems to be that "call or message" might have been intended to convey that a "telephone solicitation" can involve either a realtime conversation or a "prerecorded voice message[]." ECF 17 at 12 n.4. But even if that were what Congress had in mind *at the time*, that would not preclude the language from applying to text messages *going forward*. *See, e.g.*, *Lozano*, 702 F. Supp. 2d at 1005 (endorsing a voice-message-focused characterization of section 227(a)(4) while still agreeing that a text is a "call" as that term is used in the TCPA).

(not any particular subset thereof). The reference to "violation of the regulations," in particular, suggests that section 227(c)(5) is simply "a straightforward provision designed to achieve a straightforward result"—making violations of the FCC's rules actionable. *See Krakauer*, 925 F.3d at 650.

Moreover, if Congress wanted to limit *only* the private right of action in section 227(c)(5) to voice communications, implicitly doing so through the word "call" would have been a strange way to go about it. After all, the word "call" clearly *does* include textual communications in other provisions of the statute. *See supra*, Part I.A. If Congress intended to cabin section 227(c)(5)'s private right of action to *exclude* text messages, it wouldn't have conveyed that by using a term that elsewhere *includes* them.

Because it's doubtful that Congress intended section 227(c)(5) to have a narrower scope than the Do Not Call List regulations it exists to enforce, the much better reading of "call or message" in section 227(a)(4) is that it instead signals Congress's intent to inclusively define the kinds of "telephone solicitations" that can be prohibited. *See supra*, Part I.B. It simply "makes clear that Congress was more concerned with the purpose of the telephone communications it proscribed in the TCPA than the form in which those communications are transmitted." *Medvidi*, 2025 WL 2856295, at *3.

**b.** Shein also has no good answer for nearby uses of the word "call" in section 227(b), the autodialer provisions of the original TCPA.

As explained above, the word "call" in that context clearly covers text messages, because it is used to describe a (typically text-focused) transmission to a "paging service." 47 U.S.C. § 227(b)(1)(A)(iii); *see supra*, Part I.A. Shein and the two decisions it cites therefore cannot, and do not, dispute the consensus that the word "call" includes text messages as it is used in the

autodialer provisions. Instead, all they can say is that section 227(b) is a "different provision" that could be "arguably broader" than section 227(c). ECF 17 at 2, 7; *see also Jones*, 2025 WL 2042764, at *4–5; *Davis*, 2025 WL 2491195, at *2.

What's missing, however, is any credible reason to think that the word "call" *actually does* mean something broader in section 227(b) than it does in section 227(c). Unless there's a sound reason to think otherwise, a statutory term is presumed to have a consistent meaning throughout a statute. *See Henson*, 582 U.S. at 85. Shein identifies no reason why the meaning of "call" would differ between the two provisions. Nor does *Jones*. And the only possible distinction *Davis* can muster is to point out that 227(b) says it's unlawful to "to make any call" to various kinds of devices using an autodialer, whereas section 227(c) refers to a prohibited "telephone call" (in section 227(c)(5)'s private right of action) or a telemarketing "telephone call or message" (in the definition of "telephone solicitation" in section 227(a)(4)). 2025 WL 2491195, at *2. But it's not clear why the addition or the subtraction of the modifier "telephone" would have any bearing on the question. Shein hasn't disputed that a text is a "telephone" communication; of course it is. And whatever work "any" might be doing in section 227(b)(1)(A), *Davis* does not account for similarly broad and inclusive terminology in section 227(c), such as requiring the FCC to "prohibit *any* person from making *or transmitting* a telephone solicitation to the telephone number of *any* subscriber included" in the Do Not Call List. 47 U.S.C. § 227(c)(3)(F) (emphases added); *see supra*, Part I.B.

To the contrary, reading the word "call" differently in section 227(c)(5) than in section 227(b) would make no sense. As the FCC recently explained, it would be "anomalous" to give the word "call" a narrower meaning in section 227(c)(5) than it has elsewhere in the TCPA. 38 FCC Rcd. at 12257 ¶ 27. And, again, Congress would not have *excluded* text messages in

section 227(c)(5) by using a term that in section 227(b) *includes* them. *See supra*, Part I.C.2.a. So "there is no reason to believe that ['call'] has a different meaning when used in the do-not-call provisions." *Dawson*, 2024 WL 4765159, at *5.

**c.** Finally, Shein says that an entirely separate provision that was added to the statute in 2018 shows that section 227(c)(5) distinguishes between calls and text messages. Namely, Shein cites definitions of "caller identification" that were added by the Consolidated Appropriations Act of 2018. Pub. L. No. 115-141, div. P, § 503(a), 132 Stat. 348, 1091 (2018); *see* 47 U.S.C. § 227(e)(8)(A)–(B). Those provisions prohibit false or misleading "caller identification information," defined as information about the source of "a call made using a voice service or a text message sent using a text messaging service." 47 U.S.C. § 227(e)(8)(A). Shein says that this shows that a "call" and a "text message" are distinct.

But, if anything, section 227(e)(8) actually shows the opposite: It reinforces that texts *are* calls in the lexicon of the TCPA. After all, section 227(e) describes a "text message" as something that is done by a "caller," just like a traditional voice call is. So the more natural takeaway from section 227(e)(8) is that it identifies two different types of calls—voice calls and text messages—both of which originate with a "caller" and therefore require "caller identification." *Id.* Unlike Shein's interpretation, that reading of section 227(e)(8) accords with the meaning of "call" as that word is used elsewhere in the TCPA. *See supra*, Parts I.A–B.

In any event, even if section 227(e) did distinguish between a "text message" and a "call" as Shein contends, that would not change the best reading of section 227(c). When Congress enacted section 227(e)'s caller identification rules in 2018, Congress directed that nothing therein "shall be construed to modify, limit, or otherwise affect any rule or order adopted by the [FCC] in

connection with [the TCPA]." Consolidated Appropriations Act of 2018, § 503(d). That would include the FCC rules and orders that interpreted "call" to include text messages.

Moreover, "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 355 (1998) (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 348–49 (1963)); *see also Abbas*, 2009 WL 4884471, at *5 ("Subsequent legislation provides at best an uncertain indicator of previous congressional intent …."). Surely, that's especially true here, where the Congress that enacted section 227(c) and the Congress that enacted section 227(e)(8) legislated on opposite ends of a seismic shift in phone technology. The more meaningful comparison is to the meaning of "call" in section 227(b), which was enacted at the same time as section 227(c), and which clearly uses "call" to refer to written messages. *See supra*, Part I.A.

### D.    Any doubt that section 227(c) covers text messages should be resolved by deference to the FCC's longstanding interpretation.

The best reading of the statute is that the word "call" includes texts. But if the language of the statute leaves the status of texts unresolved, that's because Congress expressly delegated authority to the FCC to "fill up the details" of the Do Not Call List rules. *See Loper Bright*, 603 U.S. at 395. As at least one other court has held post-*Loper Bright*, section 227(c) "explicitly delegates such authority." *Skopos*, 2025 WL 2029274, at *4. So the FCC's longstanding and reasonable interpretation of the word "call" should still carry the day. *See id*.

**1.** To be sure, mere statutory ambiguity is no longer automatic cause to defer to an agency. *See Loper Bright*, 603 U.S. at 412–13 (overruling *Chevron*). And district courts are not bound by the Hobbs Act to apply FCC interpretations; they can and should begin by making their own assessment of what the TCPA means. *See McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 606 U.S. 146, 152 (2025). Shein says this means no "deference [is] owed," so courts can

now ignore the FCC's longstanding interpretation, and act "as 'if no agency were involved.'" MTD at 2, 6 (quoting *Loper Bright*, 603 U.S. at 400). But that's incorrect.

Sometimes "the best reading of a statute is that it delegates discretionary authority to an agency." *Loper Bright*, 603 U.S. at 395. Courts thus still afford deference to agency interpretations when a statute "expressly delegate[s] to an agency the authority to give meaning to a particular statutory term," tasks an agency "to fill up the details of a statutory scheme," or tells an agency "to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility." *Id.* at 394–95. In that case, a court's role is merely to "fix[] the boundaries" of agency authority and ensure "reasoned decisionmaking" within them. *Id.* at 395; *see Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 587–88 (6th Cir. 2025).

Section 227(c) is an express delegation of that sort. In the TCPA's Do Not Call List provisions, Congress didn't write the rules itself. Instead, it tasked the FCC with evaluating alternative approaches based on (among other things) open-ended criteria such as their "effectiveness in protecting … privacy rights" and their "other advantages and disadvantages." 47 U.S.C. § 227(c)(1)(A). And it empowered the FCC to make rules "that *the Commission determines* are most effective and efficient to accomplish the purposes of this section." 47 U.S.C. § 227(c)(1)(E) (emphasis added). That language grants discretionary authority to "fill up the details," and uses open-ended language that bestows "flexibility" to best effectuate the TCPA's goals. *Loper Bright*, 603 U.S. at 395; *see Hulce*, 132 F.4th at 497 n.1 (noting the FCC's "delegated authority" to make Do Not Call List rules). In the telecommunications context, especially, an express delegation like this one is evidence that Congress expected technology "to evolve and therefore charged the [FCC] with the continuing obligation to define it." *See U.S. Telecom Ass'n*

*v. FCC*, 825 F.3d 674, 718 (D.C. Cir. 2016). It follows that, if the statute doesn't resolve this question, Congress expected that the FCC would.

**2.** It therefore would honor Congress's intent here to "respect [that] delegation" and affirm the FCC's "reasoned decisionmaking" on this question. *Loper Bright*, 603 U.S. at 395, 413.

Exercising its expressly delegated authority, the FCC has reasonably explained that prohibiting texts to numbers on the Do Not Call List "make[s] … enforcement easier" and "eliminate[s] any potential confusion in the industry." 38 FCC Rcd. At 12256–57 ¶¶ 26–27 & n.59. That conclusion also aligns with the FCC's determination that cell phone numbers are eligible for protection, and that the statute's use of the word "call" confers protection from unwanted text messages in other TCPA contexts. *Id.* ¶27. And that reasonable interpretation of the word "call" is one that the FCC has consistently adhered to for more than two decades, dating back to the earliest years of the technology, when text messaging first became common. *See* 18 FCC Rcd. at 14115 ¶ 165; 30 FCC Rcd. at 8020 ¶¶ 115–16; *In re Hernandez*, 2018 WL 6830220, at *1 ¶ 3.

The FCC's conclusion that text messages are "calls" and that its Do Not Call List rules therefore have the same scope as other TCPA protections is "reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1511 (2025). Indeed, as Shein acknowledges (at 5), when *Chevron* was the deference regime that governed, courts often deferred to the FCC's judgment about the meaning of "call" in the TCPA upon finding it to be reasonable. *See, e.g.*, *Satterfield*, 569 F.3d at 954 (granting the FCC *Chevron* "deference to hold that a text message is a 'call' within the TCPA"); *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 269 n.2 (3d Cir. 2013) (agreeing with *Satterfield*). After *Loper Bright*, there are many cases where agencies' reasonable decisions are no longer entitled to deference, but this is not one of them. The FCC's judgment about the status of text messages under its rules remains within authority that the

TCPA "explicitly delegates" to the agency, and it remains reasonable—so it remains worthy of deference. *Skopos*, 2025 WL 2029274, at \*4; *see also Barton v. Delfgauw*, 2025 WL 2402131, at \*3 n.1 (W.D. Wash. 2025) (after *Loper Bright*, continuing to apply *Satterfield*'s conclusion that the FCC's judgment is entitled to deference).

**3.** Alternatively, the FCC's interpretation should—at the very least—be accorded "great weight." *Loper Bright*, 603 U.S. at 388. The FCC's position is grounded in the agency's expertise, consistent across decades, and well-reasoned. Those are the hallmarks of agency action with "power to persuade." *Id*.; *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). The FCC's longstanding and consistent interpretation of the word "call" is thus an "informed judgment" to which this Court can "properly resort for guidance." *Loper Bright*, 603 U.S. at 388 (quoting *Skidmore*, 323 U.S. at 139–40); *see Medvidi*, 2025 WL 2856295, at \*3 (accepting the FCC's interpretation as evidence of "the plain meaning of the statutory text as it has been understood by consumers, the FCC, and courts since the TCPA's passage").

## II.    Shein has not shown irreparable harm.

Shein also fails to show that it will suffer irreparable harm absent a stay. Its only assertion is that litigating a putative class action is burdensome and costly. But ordinary litigation costs do not constitute irreparable injury. *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980); *cf. CFPB v. ITT Educ. Servs., Inc.*, 2016 WL 10459784, at \*1 (S.D. Ind. 2016) (Baker, M.J.) ("[T]he expense of defending litigation does not constitute the type of irreparable harm that justifies a collateral order appeal."). This Court has already demonstrated its ability to manage its docket efficiently by vacating deadlines when appropriate to preserve resources. Defendant cannot plausibly argue that routine litigation activity—discovery, motion practice, and eventual trial—rises to the level of irreparable injury.

### III.    A stay would prejudice Mr. Richards and the putative class

While Defendant cannot show irreparable harm, Plaintiff and the putative class would face significant prejudice if this case were frozen. Plaintiff has alleged repeated unwanted text messages, precisely the kind of invasive conduct Congress sought to prevent through the TCPA.

Delaying the case would postpone relief not only for Plaintiff but also for millions of consumers whose privacy rights Congress intended to protect. *See, e.g.*, *Saleh v. Crunch, LLC*, 2018 WL 11264884, at *2 (S.D. Fla. 2018) ("a stay would prolong this matter on the Court's docket and could conceivably prejudice Plaintiff by the fading memory of any witnesses"); *Lathrop v. Uber Techs., Inc.*, 2016 WL 97511, at *4 (N.D. Cal. 2016) (plaintiffs in putative class action may "suffer prejudice from a stay because the case would extend for an indeterminate length of time, increase the difficulty of reaching class members, and increase the risk that evidence will dissipate").

The risk to the putative class members' interests is not merely hypothetical. Multiple decisions in TCPA class action cases have turned on the absence of records necessary to identify class members. *See, e.g.*, *Levitt v. Fax.com*, 2007 WL 3169078, at *2 (D. Md. 2007) (denying class certification in a TCPA case because "critical information regarding the identity of those who received the facsimile transmissions" was not available); *Pasco v. Protus IP Sols., Inc.*, 826 F. Supp. 2d 825, 831 (D. Md. 2011) (granting the defendant summary judgment for the substantially the same reason). As such, courts regularly permit plaintiffs to commence discovery prior to a Fed. R. Civ. P. 26(f) conference related to these issues implicating non-parties in TCPA cases. *See, e.g.*, Order Granting Motion to Lift Stay of Discovery, *Cooley v. Freedom Forever LLC*, No. 2:19-cv-562 (D. Nev. July 19, 2019), ECF 37; Order Granting Motion to Commence Limited Discovery, *Cooley v. First Data Merch. Servs., LLC*, No. 19-cv-1185 (N.D. Ga. July 9, 2019), ECF 32; Order Granting Plaintiffs' Motion to Commence Discovery, *Abante Rooter &*

*Plumbing, Inc. v. Birch Commc'ns, Inc.* No. 15-cv-03562 (N.D. Ga. Feb. 4, 2016), ECF 32; Order

Granting Motion for Leave to Conduct Discovery, *Mey v. Interstate Nat'l Dealer Servs., Inc.*,

No. 14-cv-01846 (N.D. Ga. Aug. 19, 2014), ECF 23.

 Plaintiff will also be prejudiced by a stay because, "with the passage of time, the memories

of the parties and other witnesses may fade, witnesses may relocate or become unavailable, or

documents may become lost or inadvertently destroyed." *Sanaah v. Howell*, 2009 WL 980383, at

*1 (D. Colo. 2009).

 As Chief Judge Pratt observed in *Doe*, continuing litigation while appeals proceed "will

simplify the issues in the case and streamline the case for trial." 2024 WL 3637789, at *3. The

same logic applies here: moving forward will refine the issues and promote judicial efficiency,

whereas granting a stay would only compound the harm to consumers and allow Defendant to

continue benefiting from unlawful practices.

## IV. The Public Interest Strongly Favors Proceeding

 The public interest also weighs heavily against a stay. The TCPA was enacted to protect

consumer privacy and deter unwanted telemarketing practices. *Krakauer*, 925 F.3d at 650.

Granting a stay here would undermine those statutory goals, delay resolution for affected

consumers, and frustrate Congress's objectives.

 In addition, Chief Judge Pratt underscored in *Doe* that "there is a public interest in judicial

economy and preventing prolonged proceedings." 2024 WL 3637789, at *3. Allowing this case to

move forward advances those interests, while staying it would postpone vindication of important

statutory rights.

 The Seventh Circuit's decision in *Blackstone* may take years and will not necessarily

control this Court's resolution of Plaintiff's claims. To stay this case based on speculation about

another appeal would be at odds with the equities of this case and Chief Judge Pratt's own guidance.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion to stay.


Dated: October 23, 2025                    Respectfully submitted,

                                           */s/ Anthony Paronich*

                                           Anthony Paronich (SBN 088733)
                                           **PARONICH LAW, P.C.**
                                           350 Lincoln Street, Suite 2400
                                           Hingham, MA 02043
                                           (617) 485-0018
                                           *anthony@paronichlaw.com*

                                           *Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Anthony Paronich, certify that on October 23, 2025, I filed Warren Richards' Opposition to Defendant's Motion to Dismiss Pursuant to Rule 12(b)(6) with the Clerk of the Court using its CM/ECF system, which will automatically send electronic notification of this filing to all attorneys of record in this action.

/s/ Anthony Paronich
Anthony Paronich